SOUTHERN RAILWAY COMPANY,
Plaintiff,

v.

CHAMPION PAPERS, INC., Defendant.

Civ. No. 2643.

United States District Court,
W. D. North Carolina,
Asheville Division.

Aug. 7, 1969.

Harold K. Bennett, Bennett, Kelly & Long, Asheville, N. C., W. T. Joyner, Joyner & Howison, Raleigh, N. C., Duncan B. Phillips, Washington, D. C., for plaintiff.

Bryce Rea, Jr., Rea, Cross & Knebel, Washington, D. C., for defendant.

MEMORANDUM OF DECISION

WOODROW WILSON JONES, Chief Judge.

This is an action to recover the sum of $52,015.27 alleged to be due the plaintiff, Southern Railway Company, by reason of the defendant, Champion Papers, Inc., paying freight charges at less than the proper rate as shown in the tariff effective during the period of from November 24, 1964, to March 28, 1966. The matter was heard by the Court without a jury on October 14, 1968, and thereafter briefs and proposed findings of fact and conclusions of law were filed by the attorneys. The Court now makes its Findings of Fact and Conclusions of Law as follows:

Southern Railway Company is a Virginia corporation and is a common carrier by railroad, subject to the Interstate Commerce Act, and was, during the period from November 24, 1964, to March 28, 1966, engaged in transporting coal in carload lots from Kentucky, Tennessee, and Virginia, to Canton, North Carolina, and other places.

The defendant, Champion Papers, Inc. was at the time of the institution of this action, an Ohio corporation with a plant and a main office in Canton, North Carolina, and is engaged in the manufacture of paper and paper products. On March 1, 1967, the defendant corporation was merged into a corporation by the name of U. S. Plywood-Champion Papers, Inc., which was organized under the laws of

the State of New York with a plant and a main office in Canton, North Carolina.

The defendant's plant is located adjacent to one of the main lines of the plaintiff Railway Company and the defendant maintains a separate railroad yard adjacent to the yard of the plaintiff at Canton, North Carolina.

During the period from November 24, 1964, to March 28, 1966, the plaintiff Railway Company had on file with the Interstate Commerce Commission a tariff which provided two different rates applicable to transportation of coal in carload lots from points of origin in Tennessee, Virginia and Kentucky, to the defendant's plant in Canton, North Carolina, as shown on "Appendix A" to the plaintiff's complaint. One rate is known and referred to as the "Single Car Rate", and the other, which is a lower rate, is known and referred to as the "Annual Volume Rate".

The defendant concedes, and the Court finds, that the shipments of coal in cars as shown in "Appendix A" of the complaint were actually made to the defendant, as consignee. The Court further finds that the dates of constructive placement of cars, actual placement of cars and the release of empty cars to the plaintiff are as shown on "Appendix B" to the Request for Admissions filed by the plaintiff.

The tariff in effect during the time in question provided for use in connection with the annual volume rate, a detention rule as shown in Item 215–a of Supplement 42 to Tariff 865–C, which provided that twenty-four (24) hours free time would be allowed at Canton, North Carolina, for unloading each car and returning it empty to the Railroad Company, the time to be computed from the hour of placement of each car in the plant or on the tracks of the consignee, the defendant herein. The tariff further provided that the regular demurrage rules as set out in Tariff 4–G–, a copy of which is attached to the Request for Admissions filed by the plaintiff and designated as Exhibit "2", should be used in connection with shipments moving under the Single Car Rate. Cars subject to the Annual Volume Rate were not subject to the regular demurrage rules, which allowed the consignee forty-eight (48) hours from 7:00 A. M. after placement of the car as free time to unload with demurrage charges to be computed thereafter, and which allowed cars to be held on constructive placement.

In transporting coal from the various points of origin in Kentucky, Virginia and Tennessee to the defendant at its plant in Canton, North Carolina, the plaintiff Railway Company provided placement service without extra charge therefor as a part of the line-haul rate —that the destination of such shipments was the plant of the defendant, consignee of said shipments, and no terminal or switching charges were imposed upon the defendant.

Tariff 4–G, the Single Car Rate, was the only rate applicable to shipments of coal over plaintiff's Railroad to the defendant's plant at Canton which provided for constructive placement of cars. Page 62 of said Tariff provides as follows:

"*Section A*

1. When delivery of a car consigned or ordered to an industrial interchange track or to other than-a-public-delivery track can not be made on account of the inability of the consignee to receive it, or because of any other condition attributable to consignee, such car will be held at destination, or, if it can not reasonably be accommodated there, at an available hold point, notice shall be given the consignee in writing, or, in lieu thereof, if otherwise agreed to in writing, that the car is held and that this railroad is unable to make delivery. This will be considered constructive placement. (See Rule 3, Section D. and E. page 59)."

The defendant notified the plaintiff by letter dated October 23, 1964, that effective at 12:00 A. M. on October 26, 1964, no cars of coal, rock salt, or chips

were to be placed in its yard except as defendant called for their placement by car number and said, "Please notify us of the arrival time and time of constructive placement of all cars of the above three commodities."

Shortly thereafter, the defendant notified the plaintiff by letter dated October 28, 1964, as follows: "Effective immediately remove Chips from the constructive placement list and have them go into Champion's Yard upon arrival until further notice. This leaves only coal and rock salt to be put on constructive placement."

The defendant then notified the plaintiff by letter dated December 4, 1964, that: "Effective immediately have rock salt go directly into Champion's Yard upon arrival until further notice. We will continue to order coal in by car number."

And, finally, the defendant advised the plaintiff by letter dated April 7, 1966, that: "Due to the Service Order 979 issued by the ICC on April 1, 1966 expiring December 1, 1966, we will accept all cars of coal upon arrival until further notice. They are to be put upon our interchange track immediately upon arrival. Please block all Southern coal arriving on one train before placing on our interchange track."

That during the period of time in question, that is, from November 24, 1964, to March 28, 1966, the plaintiff Railway Company held on constructive placement cars of coal consigned to the defendant, for varying periods of time ranging from twenty-four (24) hours up to thirteen (13) days, and placed them in defendant's yard only upon request of the defendant in accordance with the instructions contained in the letters referred to above. This operation involved extra switching movements by the plaintiff and in some instances required the holding of cars of coal in its Asheville yards because of lack of space on its Canton yard. "Appendix B" to plaintiff's Request for Admissions, prepared by plaintiff's tariff expert, shows the actual dates of arrival, constructive placement, actual placement, and release of the coal cars.

The defendant paid the plaintiff in accordance with the Annual Volume Rates as shown on "Appendix A" to the complaint, without paying detention charges as provided by the Annual Volume Rate for the periods of time cars of coal were held by the plaintiff in its yards in Canton or Asheville. It is admitted by the defendant that if payment should have been made to plaintiff in accordance with the Single Car Rate and the applicable demurrage tariffs, then the defendant owes the plaintiff $52,015.27, plus interest at the rate of 6% per annum from the date of each shipment.

If the Annual Volume Rates were applicable to the shipments in question, the defendant would owe the plaintiff the sum of $18,824.00 for detention charges, plus interest at the rate of 6% per annum from the time the detention accrued on each shipment.

In the final analysis, few, if any, of the material facts in this cause are in dispute. The sole question for answer seems to be whether the defendant, under the facts of this case, should have paid the transportation and other charges under the "Single Car Rate", or under the "Annual Volume Rate".

Under the "Single Car Rate" certain privileges and services are available that are not provided under the "Annual Volume Rate." These privileges included the services of having the Railroad to hold cars on constructive placement, of having forty-eight (48) hours, or more, of free time in which to unload the cars and return them to the Railway Company, and the use of a demurrage average agreement. While the "Single Car Rate" is higher than the other, these additional services which come with said rate are of considerable value to the shipper. Prior to October 1964 the plaintiff delivered coal cars to the defendant at its yard adjacent to the Railroad yard at Canton and there apparently was no question but that the "Annual

Volume Rate" prevailed. But the defendant desired to change the service, and by letter of October 23, 1964, advised the plaintiff that effective October 26, 1964, no cars of coal, rock salt or chips were to be placed in its yard except as called for by the defendant. The defendant further advised, "Please notify us of the arrival time and time of constructive placement of all cars of the above three commodities." By a series of letters the defendant changed the procedures relative to the delivery of these shipments and in each instance used the words "constructive placement", or other terms indicating its desire for that particular type of service. It requested that this special service be discontinued because of Service Order 979 issued by the I.C.C. on April 1, 1966.

It appears from the evidence that neither the defendant nor the plaintiff realized at first that the extra services requested by the defendant would result in increased charges under the applicable tariff. For about five (5) months after the special service was inaugurated, the plaintiff continued to bill the defendant at the lower "Annual Volume Rate." However, this error on the part of the plaintiff's billing service, defendant's refusal to pay the corrected bills, or the misunderstanding on the part of both the plaintiff and the defendant as to the applicability of the correct tariff rate are not decisive in this matter.

"Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." Louisville & Nashville Railroad Company v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

The defendant contends that it met the volume requirement of the "Annual Volume Rate" (300,000 tons of coal during the preceding twelve months) and that rate should therefore prevail. It further contends that under the "Annual Volume Rate" it was entitled to have these cars placed upon its own track and that the delay in placing them there resulting from its own instructions, would not render that rate inapplicable—that this service was a part of the over-all line-haul rate, and that if the holding of the cars involved a charge, it should be designated as "demurrage" or "detention" charges. Defendant admits that it owes the plaintiff $5,184.00 as "detention" charges, and requests the Court to award judgment to the plaintiff for that amount.

At first blush it seems that defendant's contention would be a fair and equitable solution of this controversy. However, upon closer examination it appears that such an application of the "Annual Volume Rate" would be unlawful. Section 6 of the Interstate Commerce Act, 49 U.S.C. § 6, expressly provides:

"No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time;

nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The "Annual Volume Rate" was specified in the tariff and the statute recited above prohibits the plaintiff from extending to the defendant any "privileges or facilities" under that rate except to the extent that such "privileges or facilities" are specified in the tariff. Constructive placement as requested by the defendant involved extra shifting and storage of the cars loaded with coal on plaintiff's yards until called for by the defendant, and this service was not specified in the tariff. The tariff mentioned only the volume requirement and does not list the factors that can disqualify the consignee from use of that rate. The defendant contends that since constructive placement is not listed as being precluded in the "Annual Volume Rate" that it is entitled to use it in connection therewith. There is no attempt to list all of the services which are not included in a tariff and the Act automatically excludes everything unless it is expressly mentioned and allowed in the tariff.

In the case of Chicago & Alton Railroad Company v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912), the Supreme Court said that an agreement entered into by a shipper and a railroad to deliver a shipment of horses within a certain time was unlawful and invalid because it was not included in the applicable tariff. The Court said:

"For such a special service and higher responsibility it might clearly exact a higher rate. But to do so it must make and publish a rate open to all. This was not done.

"An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs; and for a breach of such a contract, relief will be denied, because its allowance without such publication is a violation of the act. It is also illegal because it is an undue advantage, in that it is not one open to all others in the same situation."

In the case of Kansas City Southern Railway v. Carl, 227 U.S. 639, 33 S.Ct. 391, 57 L.Ed. 683 (1913), the Court said:

"The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed * * *

"Nor can a carrier legally contract with a particular shipper for an unusual service unless he make and publish a rate for such service equally open to all." Chicago & A. R. Co. v. Kirby, *supra*.

Since the "Annual Volume Rate" does not provide for constructive placement, the plaintiff could not lawfully hold cars on constructive placement under that rate and the defendant could not lawfully request the plaintiff to perform such service under that rate. It could lawfully request such service under the "Single Car Rate". Having requested and received this extra service that is outside of the "Annual Volume Rate", defendant cannot now make an extra payment designated as "detention charges" to cover such service because there is no provision in the tariff for such services or payment. The defendant could not lawfully make payment at the lower rate.

The Court therefore concludes that during the period from November 24, 1964 through March 28, 1966 the only rate filed with the Interstate Commerce Commission which allowed "constructive placement" service as requested by the defendant was the "Single Car Rate", and under the law that is the rate which the defendant must pay in this cause. To provide otherwise would result in un-

just discrimination which the Congress sought to prevent in authorizing the Commission to establish uniform rates. The plaintiff, therefore, should recover of the defendant the sum of $52,015.27, plus interest at the rate of six per centum per annum from March 28, 1966, until paid. An order to that effect will be entered simultaneously herewith.